# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| AWEIS HAJI-MOHAMED, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 3:20-cv-01052 |
| | ) | (Crim. No. 3:15-cr-00088-2) |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

Serving a 35 year sentence pursuant to a Rule 11(c) agreement with the Government, Aweis Haji-Mohamed has filed a Motion (Doc. No. 1) and Supplemental Motion (Doc. No. 9-1) to Vacate, Set Aside, or Correct Sentence in accordance 28 U.S.C. § 2255. Both motions have been fully briefed by the parties (Doc. Nos. 1, 9-1, 14, 18), and both will be denied.

## I. Factual and Procedural Background

Haji-Mohamed's prison sentence was the result of his role in a series of crimes committed in and around public housing developments in Nashville, Tennessee. More specifically, Haji-Mohamed was named in 19 of the 39 counts contained in a Third Superseding Indictment returned against him and three others on February 28, 2018.

Haji-Mohamed's alleged crimes included three counts each of (1) conspiring to commit Hobbs Act robbery; (2) Hobbs Act or attempted Hobbs Act robbery; and (3) using carrying, brandishing and discharging a firearm during and in relation to a crime of violence. He was also charged with six counts of being a felon in possession of a firearm, and two counts each of stealing a firearm and possessing a stolen firearm. Even the sheer number and descriptions of those crimes fails to capture the violence and havoc he reaped during the first three months of 2015, particularly

on those in and around the Tony Sudekum and J.C. Napier housing developments in historic South Nashville. Nor does it depict the brazenness and callousness of some of his acts.

The crimes were set out in detail by the Government during Haji-Mohamed's change of plea hearing on April 6, 2018. Those facts, agreed to by Haji-Mohamed during the hearing, generally entail three armed robberies, a theft, shots being fired with abandon, and a cold-blooded murder.

First, on January 10, 2015, Haji-Mohammed, armed with a loaded Beretta .40 semi-automatic pistol, robbed Chris Smith, a street level cocaine dealer, at the Tony Sudekum homes. During the course of the robbery (in which co-defendant Charles Braden participated), Smith's stepson (a juvenile) came outside his residence, whereupon Haji-Mohammed shot at the stepson. Fortunately, the bullet missed, but hit the bricks by the doorway and was later recovered by the police.

Second, and also on January 10, 2018, Haji-Mohammed and Ernest Eddie, robbed Isaiah Starks, another cocaine dealer, at the Tony Sudekum homes.[1] Starks was sitting in the driver seat of the car when Haji-Mohamed armed with the Beretta approach him, and Eddie went to the passenger side where he displayed a Ruger P94 pistol. After announcing the robbery and demanding everything Starks had, Haji-Mohammed fired his pistol into the pavement to show he was serious. Starks turned over a small amount of cash, but kept the drugs and money he had secreted in his clothing. Haji-Mohamed and Eddie then fled the area. Thereafter, Haji-Mohamed made several statements indicating that he wanted to kill Starks.

Third, and less than two weeks later, Haji-Mohamed and Marquis Brandon, another co-defendant, committed an armed robbery of the Cricket Wireless Store located at 13 Lafayette Street, just across the street from the JC Napier homes. In the early afternoon of January 22, 2015, Haji-

---

[1]    Starks did not live in the complex, but he frequented the area to sell his wares.

2

Mohamed and Brandon entered the Cricket store wearing hooded sweatshirts in an effort to partially cover their faces. Both were armed, with Haji-Mohammed this time carrying an SCCY semiautomatic pistol. Haji-Mohammed brandished the gun at the store clerk and demanded cash from the register. The clerk was then instructed to take off his pants, so as to slow down any possible pursuit. Meanwhile, Brandon saw that the clerk had a Springfield XD .40 caliber near him. That gun and the store cash were taken by Haji-Mohamed and Brandon, who then fled the scene.

Fourth, within the next day or two, Haji-Mohammed got into an argument with Walter Butler, a Bloods gang member and erstwhile confederate, in an apartment at the CWA complex.[2] During the argument, Butler pointed a gun at Haji-Mohamed, but then left the apartment. Haji-Mohamed went outside and saw Thomas Pointer, who was carrying Taurus Millennium .40 caliber handgun. Haji-Mohamed asked to see the gun and Pointer obliged, presumably because both had gang affiliations. Haji-Mohamed then pointed the pistol at Pointer and refused to give it back. Upon later learning that Haji-Mohamed had absconded with a gun that was shared by various gang associates, Butler called him and demanded its return. This incensed Haji-Mohamed and he made threats against Butler and his family. Haji-Mohamed carried out those threats at approximately 9:30 p.m. on January 24, 2015, when he entered Butler's grandmother's home (which was also occupied by several juveniles, including one who was disabled), and fired his Beretta several times. Responding officers found bullet holes in the wall, floor, and above a cabinet.

Fifth, in the wee hours of the morning on February 9, 2015, Haji-Mohamed received a telephone call from a female asking him to come to the area where he had previously robbed Starks. Haji-Mohamed, along with co-defendants Brandon and Reginald Johnson, III arrived at the location.

---

[2] CWA is near the James A. Cacye Homes, another public housing development in Nashville.

3

Starks was also present. At the time, Haji-Mohamed was unarmed, but Johnson told Brandon to give Haji-Mohamed the Springfield XD pistol he was carrying. Turning to Starks, Haji-Mohamed said, "bye-bye," and shot Starks in the head, killing him.

After Starks' murder, Haji-Mohamed fled the area and traveled back and forth between Nashville and Atlanta, Georgia. On August 25, 2015, the Metropolitan Nashville Police Department caught up with him and found him hiding in the trunk of a car parked in a garage at Keisha Pollard's residence. Upon being taken into custody, Haji-Mohamed told the officers that he had been on the other side of the front door when they knocked, and he thought about shooting them. He then led officers to a Starfire, 30 MI, 9mm pistol that he had hidden in a drawer in Pollard's bedroom.

Given the scope and breadth of his crimes, Haji-Mohamed faced serious charges and the prospect of substantial time in prison. For each of the six Hobbs Act robbery related charges (Counts 3, 4, 6, 7, 11, 12), he faced a sentence of up to twenty years imprisonment; for each the three carrying and brandishing a firearm charges (Counts 5, 8, 13), he faced mandatory consecutive sentences that began at no less than five years and went to life; and for each of the ten other firearm related charges, he faced the possibility of 10 years in jail. Ultimately, he agreed to plead guilty to Counts 8 and 13, which involved carrying, brandishing, and discharging a firearm during the robbery of Starks on January 10, 2015, and to using and carrying a firearm during the armed robbery of the Cricket Store twelve days later. He also agreed to a 35-year sentence.

By any measure, 35 years in federal prison is a substantial punishment, but it paled in comparison to Haji-Mohamed's exposure were he to go to trial. Not only were 17 other counts dismissed, the State of Tennessee agreed to drop a first-degree homicide case against Haji-Mohamed that would have possibly subjected him to life in prison, which would have required him to serve at

4

least 51 years.

Notwithstanding his receipt of what can only be described as a sweetheart deal, Haji-Mohamed filed a Motion to Set Aside his plea on February 20, 2019, almost a year after he pled guilty. This was primarily the result of the First Step Act that became effective on December 21, 2019, and reduced the mandatory minimums for certain gun charges. By Haji-Mohamed's calculations, the statutory maximum term for his counts convictions would have been 17 years, specifically 10 years for the discharge offense charged in Count 8 and a consecutive 7 years for the brandishing offense alleged in Count 13. After a hearing, during which Mohamed testified that he would not have pled guilty had he known that the statutory maximum would have only been 17 years under the First Step Act, the Court denied the motion not only because it came way too late, but also because Haji-Mohamed knowingly and voluntarily entered into a plea agreement that called for a 35 year prison sentence.

On December 9, 2019, the Court accepted the Rule 11(c) agreement of the parties, sentenced Haji-Mohamed to 210 months consecutive on Counts 8 and 13 for a total term of 420 months, and dismissed the remaining 17 counts. No appeal was filed.

## II. Legal Discussion

In his motion, Haji-Mohamed raises a number of ineffective assistance of counsel claims along with a claim under United States v. Davis, 139 S. Ct. 2319 (2019). He also asserts that his plea was involuntary and not in accordance Rule 11 of the Federal Rule of Criminal Procedure. Because the alleged involuntariness of plea appears to be his primary claim and it serves as a basis for several others, the Court begins there after first setting forth the basic law governing ineffective assistance of counsel claims.

5

## A. **Ineffective Assistance of Counsel Claims – General Standard of Review**

"[A]n ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal." Massaro v. United States, 538 U.S. 500, 504 (2003). "Defendants claiming ineffective assistance must establish two things. First, that the attorney's performance fell below 'prevailing professional norms.' And second, that the attorney's poor performance prejudiced the defendant's case." Monea v. United States, 914 F.3d 414, 419 (6th Cir. 2019) (citing Kimmelman v. Morrison, 477 U.S. 365, 381 (1986)). "Proving prejudice is not easy" because the petitioner is confronted with the "high burden" of demonstrating "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. (citing Davis v. Lafler, 658 F.3d 525, 536 (6th Cir. 2011)). "To show prejudice in the guilty-plea context, a defendant 'must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and instead would have insisted on going to trial.'" Hodges v. Colson, 727 F.3d 517, 534 (6th Cir. 2013) (quoting Hill v. Lockhart, 474 U.S. 52, 59 (1985)).

## B. **Rule 11 and Voluntariness of Plea**

"[G]uilty pleas must be entered knowingly, voluntarily, and intelligently in order to be constitutionally effective." Fitzpatrick v. Robinson, 723 F.3d 624, 639 (6th Cir. 2013) (citing Brady v. United States, 397 U.S. 742, 748 (1970)). "Such a determination is made after considering all of the relevant circumstances surrounding the plea or waiver." Id. "For a guilty plea to be valid, the defendant is required to understand the nature of the charges against him and the consequences of pleading guilty, including the possible punishments and loss of other rights." Id. Thus, "[t]he longstanding test for determining the validity of a guilty plea is whether the plea represents a

6

voluntary and intelligent choice among the alternative courses of action open to the defendant," Hill v. Lockhart, 474 U.S. 52, 56 (1985) (citation omitted), and a voluntary plea occurs when it is "entered by one fully aware of the direct consequences." Brady, 397 U.S. at 748.

Haji-Mohamed insists that his plea was invalid and not entered into knowingly and voluntarily because, in contravention of Rule 11, he was not correctly informed by the Court, the Government, or his own lawyer, as to the penalty for his use of a firearm in relation to Counts 8 and 13. As a consequence, he requests that the Court vacate his convictions and/or allow him to withdraw his guilty plea. Because the Court finds that Haji-Mohamed's guilty plea was unquestionably knowing and voluntary, his request will be denied.

During his plea colloquy, Haji-Mohamed was informed that, for the two counts to which he was pleading guilty, he was subject to a term of imprisonment of 35 years, consisting of a minimum ten years on Count 8 and a consecutive sentence minimum of 25 years on Count 13. Similarly, in the Agreement, Haji-Mohamed was informed that, as to Count 8, the penalty was a "mandatory consecutive term of imprisonment of not less than ten years imprisonment and not more than life," and that, as to Count 13, a "mandatory consecutive term of imprisonment of not less than twenty-five years imprisonment and not more than life[.]" (Case No. 3:15-cr-00088, Doc. No. 573 at 3). This description of the penalties comported with the language of the governing statute,[3] but were wrong according to Haji-Mohamed because it violated what he has labeled the "Washington rule."

In United States v. Washington, 714 F.3d 962 (6th Cir. 2013), defendant was convicted on

---

[3] The penalty for the first 18 U.S.C. § 924(c) violation is a mandatory consecutive sentence of five, seven, or ten years, depending on whether defendant used, brandished, or discharged a firearm during the crime. 18 U.S.C. § 924(c)(1)(A)(i)-(iii). "In the case of a second or subsequent conviction under [Section 924(c)], the person shall . . . be sentenced to a term of imprisonment of not less than 25 years." 18 U.S.C. § 924(c)(1)(C)(i).

three counts of carjacking and related firearm offenses. During the first carjacking, defendant discharged his firearm, but in the other two carjackings he merely brandished the firearm. Among the issues on appeal was how the penalties should be calculated. This was important because if the carjacking in which he discharged the firearm was counted as the first conviction, the mandatory minimum would be 10 years plus a consecutive 25 years for each of the subsequent carjackings. But, if one of the brandishing firearms charges was counted first, then the penalty would be a mandatory 7 years for that crime, plus 25 years for each of the subsequent firearm conviction. As a matter of first impression in the Sixth Circuit, the court in Washington followed the Ninth Circuit's decision in United States v. Majors, 676 F.3d 803, 814-15 (9th Cir. 2012) that "the rule of lenity cautions that such doubt be resolved in [a defendant's] favor."

To the extent that Washington announced a "rule," it was a rule related to sentencing. Specifically, "Washington holds that when a defendant is facing multiple convictions for using a firearm while committing a crime of violence under 18 U.S.C. § 924(c)(1)(A), the sentencing court should order the convictions such that the conviction with the lowest mandatory minimum is imposed first." United States v. Randall, No. 1:03-CR-246, 2015 WL 13826724, at *1 (E.D. Tenn. Oct. 26, 2015).

Applying Washington to this case–and ignoring for the moment the agreed-upon 35-year sentence–Haji-Mohamed faced a combined total mandatory sentence of 32 years, instead of 35 years. This is because the conviction for brandishing a weapon during the Cricket Store robbery as charged in Count 13 would be counted first (7 years plus a consecutive 25 years for Count 8 = 32 years), instead of the discharge offense for shooting Starks charged in Count 8 being the designated "first" conviction (10 years plus a consecutive 25 years for Count 13 = 35 years).

8

Although Washington involved the procedure to be employed at sentencing and not plea proceedings, Rule 11 requires that a defendant be informed of "any maximum possible penalty, including imprisonment." Fed. R. Crim. P. 11. Here, of course, the maximum possible penalty for Haji-Mohamed were he to be convicted on the charges in the Third Superseding Indictment was life, and he was clearly informed of that penalty. Nevertheless, for purposes of his pending Section 2255 motion, the Court will assume what Haji-Mohamed identifies as "Washington error."

"A variance from the requirements of [Rule 11] is harmless error if it does not affect substantial rights." Fed. R. Crim. P 11(h). "To affect 'substantial rights, an error must have 'substantial and injurious effect or influence in determining the . . . verdict." United States v. Dominguez Benitez, 542 U.S. 74, 81 (2004) (citations omitted). In the context of a guilty plea, defendant "must show a reasonable probability that, but for the error, he would not have entered the plea. A defendant must thus satisfy the judgment of the reviewing court, informed by the entire record, that the probability of a different result is 'sufficient to undermine confidence in the outcome' of the proceeding." Id. (quoting Strickland v. Washington, 466 U.S. 668, 694 (1984). Haji-Mohamed has not met that burden.

In support of his Motions, Haji-Mohamed submitted a declaration (attached to his reply) in which he conclusorily states, that had he known the possible penalty for his convictions on Counts 8 and 13 was 32 years, "he would not have accepted the plea bargain for 35 years and . . . would not have entered my guilty plea." (Doc. No. 18-1, Haji-Mohamed Decl. ¶ 3). He also relies heavily on United States v. Hogg, 723 F.3d 730 (6th Cir. 2013).

Hogg involved both a "unique [set of] facts and procedural posture." Id. at 733. There, defendant was charged with trafficking 50 grams or more of cocaine. Under the then-applicable

9

sentencing scheme, he faced a mandatory minimum of 10 years for trafficking that amount. After his arrest, Congress passed the Fair Sentencing Act, which drastically lowered the minimum penalty for crack offenses such that an offense involving 28 grams or more of crack would trigger a 5-year mandatory minimum, while 280 grams or more would trigger a 10-year mandatory minimum. At the time he pled guilty to the lesser offense of trafficking 5 grams of crack cocaine (while at the same time agreeing that he actually trafficked 50 grams or more), defendant was informed that the potential penalty was either 5 to 40 years, or 10 years to life, depending upon the amount of drugs involved, and whether the Fair Sentencing Act applied.

As it turns out, neither calculation was correct. This was because, after defendant was sentenced to 188 months (the low end of the advisory guideline range), Dorsey v. United States, 567 U.S. 260, 264 (2012) was decided. There, the Supreme Court held that defendants sentenced after the August 3, 2010 effective date of the Fair Sentencing Act of 2010 were entitled to the benefit of its "new, more lenient" statutory penalties. What this meant for defendant was that his actual exposure was from 0 to 20 years. As a consequence, defendant should have been allowed to withdraw his plea.

To be sure, there are several tenets announced in Hogg that help guide the analysis of whether a substantial right has been impaired because of incorrect advice about the maximum possible punishment. However, Hogg is not "indistinguishable," as Haji-Mohamed argues. (Doc. No. 9-1 at 13). One need only look to the language of Hogg to see how different the two cases are. There, "the district court materially overstated the defendant's sentencing exposure" because he "was advised that he faced a five-to-forty year statutory range, [when] his range for the offense of conviction actually was zero to twenty years." 723 F.3d at 749. This misinformation was

10

compounded because that it had a "ripple effect" on the advisory guideline calculation, decreasing it from an exposure range of 188-235 months, to 151-188 months.  Id.  It was "evident" that "this is a significant change in the sentencing calculus under which Defendant weighed the Government's plea offer."  Id.  As the Sixth Circuit explained:

> Under the information disclosed to Defendant in the plea agreement and at the plea hearing, he was to receive a 188–month sentence that was less than half of the forty-year statutory maximum sentence he faced for the offense to which he pled guilty, and that placed him at the very bottom of the 188–to–235–month advisory Sentencing Guideline range determined by the parties. What is more, by securing the Government's agreement to allow him to plead guilty to a lesser-included offense, Defendant believed he had avoided the pre-FSA statutory penalty range of 10 years to life imprisonment he would have faced for the 50–grams–or–more crack cocaine offense charged in the indictment, as well as the resulting base offense level of 37 under the career offender guideline, see U.S.S.G. § 4B1.1(b)(1).
>
> Yet, in the wake of the FSA, this deal looks considerably less advantageous to Defendant. The 188–month sentence imposed by the district court is not far below the twenty-year statutory maximum for the offense to which Defendant pled guilty, particularly when compared to the "discount" of well over half of the forty-year statutory maximum disclosed by the district court and in the plea agreement. Moreover, Defendant's 188–month sentence sits at the upper bound of the post-FSA advisory Sentencing Guideline range of 151 to 188 months, rather than at the lower bound of the 188–to–235–month range set forth in the plea agreement. Against this backdrop, Defendant seemingly did not have a great deal to lose by rejecting the Government's plea offer and going to trial on the fifty-gram-or-more crack cocaine offense charged in Count One of the indictment; under the FSA, the statutory penalty range for this offense is zero to twenty years of imprisonment, and Defendant's advisory Sentencing Guideline range for this offense presumably would have been somewhat below this twenty-year maximum, so that his resulting sentence upon conviction at trial presumably would not have greatly exceeded (if at all) the 188–month sentence called for in the plea agreement.

United States v. Hogg, 723 F.3d 730, 749 (6th Cir. 2013).

The prism through which Haji-Mohamed viewed his plea and the one used by the defendant in Hogg are vastly different.  For the crimes in the Third Superseding Indictment, that included the murder of Starks, Haji-Mohamed was looking at life imprisonment.  In fact, the advisory guideline

range as subsequently calculated was also life imprisonment. To this, Haji-Mohamed also faced state murder charges, which could add an additional 50 years or more on top of any sentence imposed in this case.

It is true, as Haji-Mohamed points out, that the Sixth Circuit in <u>Hogg</u> observed that: (1) "a district court is [not] permitted to stray beyond the four corners of the specific offense to which a defendant has agreed to plead guilty in determining how to advise him of the statutory penalty range he faces for this offense"; and further that (2) "the Government's claims about offenses it could have proven or relevant conduct to which a defendant has admitted for purposes of Sentencing Guideline calculations have [no] bearing on the pertinent district court obligations under Rule 11(b)(1)(H)-(I)—namely, to accurately inform a defendant of the statutory penalty range for the crime to which he is pleading guilty." <u>Hogg</u>, 723 F.3d at 750. By the same token, however, the Sixth Circuit has observed that, "[w]hen considering a plea agreement, a defendant might well weigh the terms of the agreement against the maximum sentence he could receive if he went to trial." <u>Pitts v. United States</u>, 763 F.2d 197, 201 (6th Cir.1985). Moreover, after making the comment about straying from the four corners of the specific offense involved, the Sixth Circuit in <u>Hogg</u> went on to state:

> The requirements of Rule 11(b)(1)(H)-(I), after all, are not designed to inform a defendant generally of the penalties he would face for any conduct to which he has admitted, nor to advise him of the pertinent penalties for the offenses charged in the indictment in the **absence** of a plea agreement. Rather, these Rule 11 requirements are intended to ensure that the defendant is informed of the penalty range he faces **in light of** the terms governing his specific agreement to plead guilty. The task of the district court, in other words, is not to alert the defendant to the universe of considerations that might be relevant to his plea negotiations with the Government, but to advise him more specifically of the factors bearing on his acceptance or rejection of the particular deal actually offered by the Government and reflected in the parties' plea agreement, so that he may make an informed decision whether to

accept this arrangement and plead guilty in accordance with its terms.

Hogg, 723 F.3d at 751 (emphasis in original). This is in keeping with Hogg's earlier observation that "plea agreements must be interpreted in accordance with ordinary contract principles, with the intent of the parties ascertained primarily through the chosen wording of their agreement, and with any ambiguities construed against the Government." Id. at 744 (citing United States v. Moncivais, 492 F.3d 652, 662 (6th Cir.2007); Smith v. Stegall, 385 F.3d 993, 999 (6th Cir.2004)).

There was no ambiguity in the plea agreement. In exchange for pleading guilty, Haji-Mohamed would serve a 35-year prison sentence. The "factors bearing on his acceptance or rejection of the particular deal actually offered by the Government and reflected by the parties' plea agreement," Hogg, 723 F.3d at 21, was that in exchange for the plea and sentence, the Government would dismiss seventeen other charges, several of which carried a life sentence, and the State of Tennessee would dismiss yet another murder charge.

Notwithstanding the minimal 3-year (8.57%) difference between the penalty stated by the Court and the one supposedly required by the Washington rule, Haji-Mohamed insists that he would have not pled guilty had he known the actual minimum sentence was 32 and not 35 years. In addition to saying so in his Declaration, he claims that other things in the record support his position, none of which the Court finds persuasive.

In his reply brief, Haji-Mohamed identifies "five facts" that supposedly establish his "present assertion is true: Had he known, in light of Washington, that his mandatory minimum was less than 35 years, he would not have accepted the 35-year deal and would have continued to run the risk of the state prosecution." (Doc No. 18 at 11). Some of these are not demonstrable facts at all, but rather beliefs, opinions, or speculation (e.g., he "was only barely persuaded to take the 35-year deal,"

13

and "the federal case was given precedence" because "the somewhat flimsy § 924(c) charges were a better bet for a conviction than the state murder charge."). (Id.). Regardless, through these "facts" Haji-Mohamed invites the Court down a rabbit hole that it need not explore. This is because the Court had the opportunity to preview whether the statutory minimum – or the actual offered time – was the driving force behind his plea during the proceedings in which he attempted to withdraw it. At the time, the Court also had the opportunity to observe Haji-Mohamed's demeanor and consider his credibility.

With the enactment of the First Step Act, Haji-Mohamed thought he could get his sentence cut in half. So, during the course of the evidentiary hearing on his motion to withdraw plea, he disputed the Government's assertion that the mandatory minimum had nothing to do with the plea, and insisted the mandatory minimum was what prompted him to agree to a 35-year term of imprisonment in the first place. When prompted to explain, Haji-Mohamed testified:

A. Because I – that was the mandatory minimum I could have got.

Q. Okay.

A. That was – that was – that was my understanding of it, like, this is the lowest you can get. You can't get no lower than the 35, because it would have been ten and then 25 mandatory minimum.

(Case No. 3:15-cr-00088, Doc. No. 706, Tr. at 7).

Quite clearly it was in Haji-Mohamed's interest to testify that the mandatory minimum was what led him to plead, otherwise his First Step Act claim would go nowhere. It was also clear that there were other things driving his request, most notably "buyer's remorse" and the reality that he would face decades in prison. Additionally, were he allowed to withdraw his plea, it didn't hurt that co-defendant Brandon had by then been acquitted of the Cricket store robbery count, and a key

14

witness had died.  Obviously, these factors might help his bargaining position in any subsequent negotiations.

At the time of the hearing on the motion to withdraw, the Court was not called upon to assess Haji-Mohamed's credibility in regard to his testimony that the mandatory minimum is what led him to plead guilty – there were plenty of other reasons to deny the request.  See United States v. Sydnor, 762 F. App'x 284, 288 (6th Cir. 2019) ("The idea behind Rule 11 is to provide a rare remedy for 'real confusion or misunderstanding' about the plea agreement, not for buyer's remorse").  Nevertheless, the Court clearly remembers the hearing and clearly remembers Haji-Mohamed.  The Court also recalls stating, "I think for the most part you're being forthright with the Court."  (Tr. at 40).  That observation, however, did not extend to his testimony that his plea was solely the result of his understanding that the mandatory minimum for Counts 8 and 13 was 35 years, as opposed to 35 years being a godsend in light of the number of charges (federal and state), and the very real prospect that he could spend his dying days in prison.  Simply put, the Court does not believe his assertion that the 35 years was tied to the mandatory minimum for Counts 8 and 13.

Even though the focus here is from Haji-Mohamed's perspective, other evidence in the record supports this conclusion.  For example, during the change of plea, the Court and Haji-Mohamed had the following exchange:

> THE COURT: All right. Then let's go to your plea agreement. In particular, let's go to paragraph 12. Because in paragraph 12 it appears that you and the government have reached an agreement to recommend to the Court that I impose a custody sentence of 420 months, followed by five years of supervised release.  Is that your understanding, your agreement with the government?
>
> THE DEFENDANT: Uh-huh.
>
> THE COURT: And you need to –

15

THE DEFENDANT: Yes. Yes.

THE COURT: And that's the recommendation that you are making to the Court –

THE DEFENDANT: Yeah.

THE COURT: – correct?

THE DEFENDANT: Yes.

(Case No. 3:15-cr-00088, Doc. No. 624, Tr. at 12). At no point during his plea did Haji-Mohamed suggest that the 420 months was agreed to by him because it was based upon a mandatory minimum.

Further, in its response to the Motion to Withdraw Guilty Plea, the Government asserted that the selection of counts was "fortuitous" because the plea "was negotiated by reaching an agreement as to the total term of years, and then choosing various counts to which [defendant] would actually plead guilty." (Case No. 3:15-cr-00088, Doc. No. 876 at 1). Similarly, David Komisar, Haji-Mohamed's trial counsel, has declared under oath that he sought a global settlement for both the federal and state charges. Towards that end, the Assistant United States Attorney first proposed 40 years, he countered with 30 years, and they agreed to split the difference. Thereafter, the Government drafted the plea agreement, calling for a 35 year sentence. It mattered not a whit as to how those years were distributed as to counts, so long as they totaled 35. (Doc. No. 14-1 Komisar Dec. ¶ 7). Moreover, even though Haji-Mohamed did not see eye-to-eye with Komisar on some issues, at his change of plea hearing he applauded counsel's efforts, stating, "[a]nd Mr. Komisar even – regardless of our differences, he's able to still give me this 35." (Case No. 3:15-cr-00088, Doc. No. 624, Tr. at 14).

Accordingly, the Court finds that Rule 11 error, if any, did not violate Haji-Mohamed's substantial rights and his request for relief on this claim will be denied.

16

**C. Ineffective Assistance of Counsel**

**1. Mandatory Minimum Sentence and Withdrawal of Plea**

Haji-Mohamed's first ineffective assistance claim is based upon counsel's failure to recognize the "Washington rule" and his consequent failure to argue that "rule" when Haji-Mohamed moved to withdraw his plea. This entire argument is a non-starter because Strickland requires a showing of prejudice. As already explained, Haji-Mohamed's sentence was an 11(c) agreement to serve 35 years, not to serve whatever the mandatory minimum could turn out to be for the charges to which he pled. Haji-Mohamed was not prejudice by receiving the benefit of the bargain he struck with the Government.

This claim also fails because, in addition to prejudice, Strickland holds that "the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial [or plea proceedings] cannot be relied on as having produced a just result." Id. at 686. Even though, as Haji-Mohamed points out, "Washington was published precedent at the time of [his] plea," the Court disagrees that "it was directly applicable" (Doc. No. at 12) given the very nature of a Rule 11(c) plea. Nor does the Court believe that the Sixth Amendment requires counsel to be a walking lexicon of all published cases, or at least not those that establish a "rule" in an entirely different context.[4]

───────────────

[4]  It is even more of a stretch for Haji-Mohamed to argue that "counsel should have bolstered the existing grounds for withdrawal" by asserting that "in the case of a similarly-situated defendant (Sands), the government had conceded the defendant could withdraw in light of the First Step Act[.]" (Doc. No. 9-1 at 17). Presumably, this a reference United States v. Sands, No. 2:17-cr-261, 2019 U.S. Dist. Lexis 28498 (S.D. Ohio Feb. 22, 2019) cited earlier in Haji-Mohamed's brief. If so, that is an out-of-district case, which is unpublished to boot. Moreover, while the decision appears in Lexis, it does not appear on Westlaw. Besides, why the government chose to concede withdrawal of the plea in Sands is unstated, and in other cases it has objected to withdrawal of a plea notwithstanding the First Step Act. See United States v. Hardy, 838 F. App'x 68, 72 (5th Cir. 2020) (government objected to withdrawal of plea and appeals court found no abuse of discretion in denying defendant's motion to withdraw his 11(c) guilty plea based on the passage of the

The same holds true for Haji-Mohamed's claim that counsel was ineffective because he failed to advise him that he should file a direct appeal on the grounds that the plea was involuntary and in violation of Rule 11 because of the supposed "Washington error." Accordingly, the Court will not vacate Haji-Mohamed's plea, allow him to withdraw it, or restore his right to appeal as he requests.

### 2. Imposition of the Sentence

During the sentencing hearing, the Court stated, "[s]ince I'm accepting your C agreement, the calculation of the guideline is really moot," and imposed the 35 year sentence. When filling out the judgment, the Court indicated that it was accepting the Presentence Report that recommended life imprisonment, that the sentence would be a consecutive 17.5 years on each count, and the 35 years was a downward variance from the Guidelines range. This, according to Haji-Mohamed, violated Section 3553's requirement that "the sentencing court [] state 'in open court' the sentence, its 'reasons for its imposition of the particular sentence,' and whether the sentence falls within the guideline range and any reason for a departure or variance from that range." (Doc No. 9-1 at 17) (quoting 18 U.S.C. § 3553(c)). Haji-Mohamed argues that Komisar was ineffective in failing to somehow challenge the judgment or the Court's procedure.

Even if Haji-Mohamed is correct, none of this impacted his sentence and he accordingly was not prejudiced. Further, with regard to this claim and several others raised by Haji-Mohamed, the following observations from a recent Sixth Circuit case bear repeating:

> The Sixth Amendment "does not guarantee perfect representation" but only "reasonably competent" representation. Harrington v. Richter, 562 U.S. 86, 110, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) (cleaned up). Thus, defense lawyers need not (and in fact should not) raise every colorable argument they can find. See Davila v. Davis, ––– U.S. ––––, 137 S. Ct. 2058, 2067, 198 L.Ed.2d 603 (2017) ("Effective appellate

First Step Act).

counsel should not raise every nonfrivolous argument[.]"); <u>Wilson v. McMacken</u>, 786 F.2d 216, 219 n.3 (6th Cir. 1986) (trial counsel need not make "every colorable objection"). Tough judgment calls about what to challenge and what to let slide are part of lawyering. Such decisions only become deficient – that is, incompetent – when no reasonable counsel would have made the same choice at the time. <u>Strickland</u> [<u>v. Washington</u>], 466 U.S. [668] at 690, 104 S.Ct. 2052 [80 L.Ed.2d 674 (1984)]. Here, even if [defendant's] claims could be called colorable, there's simply no argument that they were so strong that every reasonable defense attorney would have run with them.

<u>Moody v. United States</u>, 958 F.3d 485, 492 (6th Cir. 2020).

### D. <u>Void for Vagueness and *Davis*</u>

Haji-Mohamed argues that counsel was ineffective in failing to argue *a la* <u>Johnson v. United States</u>, 135 S.Ct. 1551 (2015) that 924(c) was void-for-vagueness.[5] Relatedly, he asserts that his convictions on Counts 8 and 13 charging section 924(c) violations cannot stand.

Section 924(c) defines a "crime of violence"" in two ways. It is an offense that is a felony and:

> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3). Subsection (A) is often referred to as the force clause, the use-of-force clause, or the elements clause, while Subsection (B) is often referred to as the residual clause or the substantial-risk clause.

In <u>Davis</u>, 139 S. Ct. at 2336, the Supreme Court found the residual clause of Section 924(c)(3) to be unconstitutionally vague. This means that conspiracy to commit Hobbs Act robbery

---

[5] This issue was not raised until after Haji-Mohamed filed a motion to amend (Doc. No. 9) to add the <u>Davis</u> claim. If the claim should have been so obvious to trial counsel, query why it was not raised in post-conviction counsel's first filing, instead of months later.

19

is not a crime of violence for purposes of 924(c) because it is based upon the residual clause. <u>United States v. Ledbetter</u>, 929 F.3d 338, 360–61 (6th Cir. 2019). Likewise, this Court has held that attempted Hobbs Act robbery is not necessarily a crime of violence because use-of-force is not an essential element. <u>See</u> <u>Starks v. United States</u>, No. 3:15-CR-00147-5, 2021 WL 351995, at *10 (M.D. Tenn. Feb. 2, 2021). On the other hand, the Sixth Circuit has held that "Hobbs Act robbery constitutes a crime of violence," <u>United States v. Gooch</u>, 850 F.3d 285, 292 (6th Cir. 2017), and this remains true, even post Davis. <u>Porter v. United States</u>, 959 F.3d 800, 804 (6th Cir. 2020).

In this case, Count 8 charged the following:

On or about January 10, 2015, in the Middle District of Tennessee, [2] AWEIS HAJI-MOHAMED a/k/a SON SON and [5] CHARLES BRADEN a/k/a MANSTINKA did knowingly use, carry, brandish, and discharge firearms during and in relation to a crime of violence, to wit: robbery, attempted robbery, and conspiracy to commit a robbery affecting commerce in violation of Title 18, United States Code, Section 1951, relating to an armed robbery of Isaiah Starks a/k/a Blue, who they believed to be a drug dealer.

All in violation of Title 18, United States Code, Sections 924(c)(1)(A) and 2.

(Case No. 3:15-cr-00088, Doc. No. 481 at 6). Count 13 used substantially the same language in relation to the Cricket Store robbery. (<u>Id.</u> at 7-8).

Because Haji-Mohamed was charged with using a firearm in relation to a robbery, attempted robbery and/or a conspiracy to commit robbery, he claims "it was possible that [his] plea was sustained on just the admission to a Hobbs Act conspiracy (or perhaps to a Hobbs Act attempt), rather than to an admission to completed Hobbs Act robbery." (Doc. No. 9-1 at 22). The problem with this argument is that it entirely ignores his agreement to the facts presented at the plea colloquy and those contained in the statement of facts attached to his Plea Agreement. (Case No. 3:15-cr-00088, Doc. No. 527 at 13-18).

20

With respect to Count 8, Haji-Mohamed admitted that: (1) he, Braden, and another, agreed to rob Starks; (2) he was armed with a Beretta; (3) he demanded drugs and money from Starks; (4) he fired the weapon into the ground to show he was serious; and (4) he stole cash from Starks. With regard to Count 13, Haji-Mohamed admitted that: (1) he and Brandon agreed to commit an armed robbery of the Cricket store; (2) they entered the store while Haji-Mohamed was carrying an SCCY semi-automatic pistol; (3) he pointed his pistol at the store clerk; (4) he demanded money; and (5) he fled with cash from the store, while Braden fled with the clerk's pistol. While those admissions include conspiracy to commit armed robbery, they also show that Haji-Mohamed committed Hobbs Act robbery in relation both to Starks and the Cricket store. For both counts, he admittedly committed a crime of violence.[6] Davis does not hold otherwise.

## E. Certificate of Appealability

Under the Anti-Terrorism and Effective Death Penalty Act of 1996, "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A prisoner seeking a COA must prove 'something more than the absence of frivolity' or the existence of mere 'good faith' on his or her part." Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) (citing Barefoot v. Estelle, 463 U.S. 880, 893 (1983)). Instead, "'[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment

---

[6] In this regard, Haji-Mohamed's reliance on Stromberg v. California, 283 U.S. 359, 367-78 (1931) is misplaced. There, the Supreme Court stated that when a jury is instructed on alternative theories, one of which is plainly unconstitutional, a conviction based upon a general verdict must be set aside. Here, the Court is not not dealing with a general verdict, but rather Haji-Mohamed's admission to Hobbs Act robbery of the Cricket Store and Starks. See Burleson v. United States, No. 3:20-CV-487, 2020 WL 7027503, at *3 (M.D. Tenn. Nov. 27, 2020) ("[U]nlike in Stromberg, we can ascertain that Burleson was convicted of both underlying crimes of attempted Hobbs Act robbery and attempted Hobbs Act extortion")

of the constitutional claims debatable or wrong.'" Id. (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)). Haji-Mohamed has not made that showing with respect to any of his claims and, accordingly, a certificate of appealability will not issue.

### III.  Conclusion

On the basis of the foregoing, Haji-Mohamed's Motion and Amended Motion to Vacate, Set Aside, or Correct Sentence in Accordance with 28 U.S.C. § 2255 (Doc. Nos. 1, 9-1) will be denied. A certificate of appealability will not issue.

An appropriate Order will issue.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

22